IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE
ADMINSTRATIVE INSPECTION OF:

23- MJ-104

STAINLESS FOUNDRY & ENGINEERING, INC.
5150 NORTH 35TH STREET
MILWAUKEE, WISCONSIN 54

## AFFIDAVIT OF BRENDA WHITNEY

State of Wisconsin
County of Milwaukee

I, Brenda Whitney, declare and testify as follows:

1. The statements made in this affidavit (which consists of fifteen pages) are based on my personal knowledge and knowledge I have gained from my review of records maintained by the Wisconsin Department of Natural Resources, the United States Environmental Protection Agency (U.S. EPA), Region 5, and documents and information submitted by Stainless Foundry and Engineering, Inc. ("Stainless Foundry" or "SF&E"), or its representatives.

2. I am currently employed as an Environmental Engineer in the Land Enforcement and Compliance Assurance Branch (LECAB), Enforcement and Compliance Assurance Division (ECAD), U.S. EPA, Region 5. I have been employed with U.S. EPA as an Environmental Engineer since August 2003.

3. In June 2000, I received a Bachelor of Arts Degree in Environmental Science from Northwestern University in Evanston, Illinois. In August 2003, I received a Master of Science in Environmental Engineering, also from Northwestern University.

4. From August 2003 to the present, I have worked as an Environmental Engineer in the Resource Conservation and Recovery Act (RCRA) Branch of ECAD, in Region 5 of U.S. EPA. In this position, I serve as an inspector and enforcement officer.

5. As an Environmental Engineer in the RCRA Branch of ECAD, I perform various investigative and enforcement activities concerning suspected violations of the nation's primary federal hazardous waste law, RCRA. I have attended several training seminars on conducting inspections and case development, as well as other subjects relating to enforcement and compliance with RCRA.

6. As part of my duties, I have conducted inspections under the authority of Section 3007 of

RCRA, 42 U.S.C. § 6927, in order to determine compliance with RCRA and the regulations promulgated under the authority of RCRA. Section 3007 of RCRA, 42 U.S.C. § 6927, authorizes representatives of U.S. EPA to (1) enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from; and (2) inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes. I am duly authorized by U.S. EPA to conduct such inspections. While working in my capacity as an Environmental Engineer with U.S. EPA, I have conducted approximately ten to twenty RCRA compliance inspections per year. I have inspected several metal foundries that generate hazardous wastes.

7. In my capacity as an Environmental Engineer, I also work with U.S. EPA Region 5's Office of Regional Counsel and the United States Department of Justice to develop and resolve enforcement cases against persons who violate RCRA and its implementing regulations.

## Statutory and Regulatory Background

8. This investigation concerns potential violations of RCRA, 42 U.S.C. §§ 6901 through 6992k, and regulations promulgated under that statute. RCRA is the Nation's primary hazardous waste legislation. RCRA was enacted in 1976 as a response to the growing number of hazardous waste sites resulting from unregulated disposal practices. RCRA's objectives include protection of human health and the environment and conservation of valuable material and energy resources. 42 U.S.C. § 6902. RCRA accomplishes its objectives in part through a "cradle-to-grave" regulatory system governing the generation, storage, transportation, tracking, treatment and disposal of hazardous wastes. 42 U.S.C. §§ 6921-6939e.

9. RCRA defines a hazardous waste, in relevant part, as "a solid waste ... which because of its quantity, concentration, or physical, chemical or infectious characteristics may -- (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

10. In order to be regulated as hazardous waste under RCRA, a material must first be a "solid waste." Generally speaking, the RCRA regulations define the term "solid waste" as any discarded material, with some exclusions. 40 C.F.R. §§ 261.2(a)(1) and 261.4(a). RCRA regulations define discarded material as any material which is abandoned; recycled; inherently waste-like; or certain military munitions, as 40 C.F.R. Part 261 further defines those four terms. 40 C.F.R. § 261.2. Abandoned materials include those that are "accumulated, stored, or treated ... before or in lieu of being abandoned by being disposed of ..." 40 C.F.R. § 261.2(b).

11. A "solid waste" is considered a hazardous waste under RCRA in two ways. First, RCRA regulations may define a solid waste as a hazardous waste if that waste appears on one or more lists of hazardous wastes in the RCRA regulations. 40 C.F.R. § 261.30 *et. seq.* These lists describe each listed hazardous waste as either a particular chemical compound, or waste from a specific industrial process. These lists code hazardous wastes with the letters F, K, P or U,

followed by a number. Second, RCRA regulations may define a solid waste as a hazardous waste if that waste exhibits any of the following characteristics: ignitability, corrosivity, reactivity or toxicity. 40 C.F.R. § 261.20, *et. seq*. These characteristics are typically determined by analytical procedures specified in the regulations.

12. Among the contaminants that can make a waste a "hazardous waste" under RCRA is chromium. Generally speaking, when an extract from solid waste is found to contain chromium at a concentration of 5.0 milligrams per liter (mg/L) or greater, as determined by a specific analytical procedure known as the Toxicity Characteristic Leaching Procedure (TCLP), Test Method 1311, the waste exhibits the hazardous characteristic of toxicity for chromium and is considered a hazardous waste for purposes of RCRA. 40 C.F.R. § 261.24.

13. RCRA authorizes U.S. EPA to promulgate regulations setting forth standards applicable to hazardous waste generators and transporters, as well as owners and operators of hazardous waste treatment, storage and disposal ("TSD") facilities. 42 U.S.C. §§ 6922-24. Under that authority, U.S. EPA has promulgated regulations which are set forth at 40 C.F.R. Parts 262, 263 and 264-270. RCRA also establishes a nationwide permit program for owners and operators of TSD facilities. 42 U.S.C. § 6925.

14. Once a waste has been identified as a hazardous waste, it is subject to the regulations promulgated under RCRA. Hazardous wastes may be transported to, stored at, and treated by or disposed of at permitted TSD facilities only. 42 U.S.C. §§ 6925 and 6926. Each RCRA permit imposes regulatory conditions that are specifically tailored and limited to the types of hazardous waste and associated waste-handling activities at that particular facility. A facility may only handle those hazardous wastes and perform those activities specified in its RCRA permit. 40 C.F.R. Part 264.

15. As a general matter, the RCRA regulations allow a generator who generates 1,000 kilograms or greater of hazardous waste per calendar month (also referred to as a "large quantity generator") to store its own hazardous waste at its facility for up to 90 days without a RCRA TSD permit, if that generator meets certain storage and recordkeeping requirements. 40 C.F.R. § 262.34(a). Large-quantity generators without an agency-granted extension must have a TSD permit to store hazardous waste for more than 90 days. 40 C.F.R. § 262.34(b).

16. In order to create a cradle to grave tracking system for hazardous wastes, a manifest generally must accompany a shipment of hazardous waste that is being transported. The generator of a waste is required to assess whether it is solid waste and a hazardous waste. The generator, the transporter and the designated permitted facility that receives the waste all must retain copies of that manifest. Among other things, the manifest must contain a complete description of the waste; the quantity and type of containers holding the waste; and the name and address of a receiving facility that is permitted to handle the waste. 40 C.F.R. § 262.20, *et. seq.*

17. Under RCRA, states may, with U.S. EPA's approval, operate a hazardous waste regulatory program. 42 U.S.C. § 6926. U.S. EPA has authorized the State of Wisconsin to administer a state hazardous waste program. 40 C.F.R. § 272.1200 *et seq.*; *51 Fed. Reg. 3783*

(January 31, 1986) (original authorization of WI hazardous waste regulatory program); *54 Fed. Reg. 22278* (June 6, 1989) (amended authorization); *54 Fed. Reg. 48243* (November 22, 1989) (amended authorization); *57 Fed. Reg. 15029* (April 24, 1992) (amended authorization); *58 Fed. Reg. 31344* (June 2, 1993) (amended authorization); *59 Fed. Reg. 39971* (October 4, 1994) (amended authorization); *64 Fed. Reg. 42630* (August 5, 1999) (amended authorization); *67 Fed. Reg. 43027* (June 26, 2002) (amended authorization); *74 Fed. Reg. 17423* (April 15, 2009) (amended authorization); *74 Fed. Reg. 17785* (April 17, 2009) (amended authorization). Even when a State has been authorized to administer its own hazardous waste regulatory program, U.S. EPA retains the legal ability to enforce RCRA and to take enforcement actions for violations of RCRIA within that State in both civil and criminal proceedings. 42 U.S.C. § 6926.

## Factual Background

18. On March 10, 2022, the WDNR referred an investigation of Stainless Foundry to U.S. EPA, Region 5, and I was assigned to this matter at that time.

19. On or about February 9, 2022, and March 10, 2022, I received electronic copies of various records from the WDNR, including but not limited to inspection reports.

20. On or about May 5, 2022, I drafted and caused to be issued a Request for Information via email to the President of Stainless Foundry & Engineering, Inc., under the authority of Section 3007 of RCRA, 42 U.S.C. § 6927. Among the inquiries made in this Request for Information was a request that SF&E "Provide brief descriptions of the operations, including on-site manufacturing/production, on-site industrial cleaning and maintenance processes, the generation of any solid and/or hazardous wastes, any waste streams that are diluted with water or other substance, waste streams that are mixed with other waste streams, methods of waste analysis, on-site waste management practices."

21. On or about July 8, 2022, I received a partial response to the Request for Information from SF&E. I later received a supplemental response from SF&E on or about August 16, 2022. In the July 8, 2022, response, the company provided a description of its operations. Below are relevant excerpts from that description:

SFE [*sic.*] is a sand and investment casting foundry serving a wide variety of industries. Operations consist of the following:

- Furnaces for melting steel.
- Pattern, core, and mold making operations (sand and investment castings).
- Pouring (casting) operations.
- A kolene furnace for cleaning castings by removing internal ceramic material in liquid sodium hydroxide.
- Grinding and blasting operations.
- Welding for both production and maintenance purposes.
  *
  *

>   \*
>   Solid wastes generated at SFE include the following:
>
>   - Kolene sludge (D007 hazardous waste): As described above, the Kolene furnace is used to remove ceramic material from castings by soaking them in a molten sodium hydroxide bath. Castings are then rinsed in a stagnant rinse bath. The rinse water is sent through an indexing fabric filter where solids are removed prior to discharge to the sanitary sewer in accordance with SFE's industrial wastewater discharge permit issued by the Milwaukee Metropolitan Sewerage District (MMSD). The Kolene furnace is periodically cleaned out and the resulting solid/sludge material is placed in a supersack for off-site disposal. The fabric filter media and associated solids from the rinse water are also placed in the supersack with the sludge.
>   \*
>   \*
>   \*
>
>   - Dust collector wastes: There are several dust collectors which collect particulate from a number of sources generating particulate emissions including grinding, blasting, cut-off saws, and welding.
>
>   - Foundry sand: used foundry sand is placed into a waste dumpster for off-site disposal (note that ~75% of sand is reclaimed on-site).

In addition, Appendix A to SF&E's response, entitled "Waste Matrix and Waste Determination Documentation," described one waste generated at the facility as "Dust/particulate collected by dust collectors," which was identified as "Non-Hazardous" waste which the facility operators managed in "dust collector receptacles" and "transferred to sand lugger." Furthermore, a diagram in Attachment A1 to SF&E's response depicts "particulate emissions" from grinding and cutting operations going to a "dust collector" for eventual disposal. On the basis of these descriptions, I concluded that grinding operations at the SF&E facility generated particulate emissions which were captured in one or more dust collection systems.

 22. On or about December 21, 2022, I participated in a discussion with Investigative Warden Mike Dieckhoff of the WDNR. During that conversation, Warden Dieckhoff advised me that his office was referring an investigation to U.S. EPA, Region 5, for a possible federal civil enforcement action. Warden Dieckhoff further informed me of various witness interviews with former SF&E employees who alleged that the persons in charge of operating the facility had mischaracterized one of the wastes generated by the foundry – specifically, the baghouse dust – as non-hazardous waste, when in fact this waste was a hazardous waste; and that the operators of the facility had directed employees to ship this baghouse dust offsite for disposal as non-hazardous waste. If true, these allegations would demonstrate one or more violations of RCRA (as described in more detail below).

 23. On or about December 21, 2022, Warden Dieckhoff delivered to me electronic copies of

numerous interview reports, WDNR inspection reports, digital photographs and other records pertaining to his investigation of Stainless Foundry. The most relevant information from these documents is summarized in the paragraphs below.

24. Among the interview reports provided to me by Warden Dieckhoff were two reports of separate interviews of a former Stainless Foundry employee whom I will refer to as "Former Employee X" due to Privacy Act concerns. In the first report, dated July 27, 2022, Warden Dieckhoff summarized his initial interview of Former Employee X. According to Warden Dieckhoff's report, Former Employee X made the following statements, among others:

   a. Former Employee X stated that he began working for Stainless Foundry in January 2008 and continued until 2016 (working in manufacturing), and that he had worked in maintenance from April or May of 2018 until 2020.

   b. Former Employee X told Warden Dieckhoff, "I have seen some pretty shady stuff in the past." He elaborated on this statement, explaining that he had seen SF&E covering up the "chrome" levels in the baghouse dust. He explained that they are supposed to be bagging baghouse dust, and that he has seen that waste go directly into the landfill dumpster, even though there was a special roll off for the baghouse dust. Former Employee X said that about a ton of baghouse dust went into the landfill dumpsters each month.

   c. In response to Warden Dieckhoff asking whether the baghouse dust was considered a hazardous waste, Former Employee X said it was, specifying that it was hazardous waste because of the chromium levels.

25. In the second interview of Former Employee X (report dated July 29, 2022), Warden Dieckhoff summarized the following statements made by Former Employee X:

   a. When Warden Dieckhoff showed Former Employee X two hazardous waste manifests (dated 04-23-19 and 01-23-20) that appeared to have his signature, Former Employee X confirmed that the signatures were his, and explained that he had been put in charge of Environmental Health and Safety (EHS) after the person holding that position left the company in 2018, and her replacement later was let go; at that point, Former Employee X was told to take on the EHS responsibilities. He had to make sure the hazardous waste was weighed, covered and sign off on the manifests. Former Employee X's boss directed him to sign off on those manifests.

   b. Former Employee X stated that, when he left the company in 2020, SF&E ran two full shifts to get things running before the morning shift (6:00 am -2:30pm, 2:30 pm-11:00 pm, and some people would arrive at 3:00 am for a partial 3rd shift).

   c. When Warden Dieckhoff showed Former Employee X a photograph depicting blue-colored square or rectangular objects, Former Employee X advised Warden Dieckhoff that there were two baghouse dust collectors and identified these collectors as the blue square or rectangle objects depicted in the photograph.

d. Former Employee X stated that the baghouses collect the fines from all grinding booths and cleaning rooms as well as the sand and stuff from the reclaim area within the facility. Former Employee X specified that the grinding booths and cleaning rooms are filtered through the smaller baghouse filter (south filter) and the reclaim dust is collected in the larger baghouse filter (north filter).

e. Former Employee X said that he thought they were supposed to send samples out for testing from the baghouse every 6 months, but he knew they were supposed to sample that material. This was not Former Employee X's role to know or manage this, but this was his recollection.

f. Former Employee X stated that the role of Maintenance with respect to the baghouse was to make sure that the dust-collection system was working the way it was supposed to, mechanically. The plastic bags management was the responsibility of the department supervisor. Former Employee X said the bags were plastic and would rip regularly and would sit for up to a day with rips and would not be fixed sometimes for an entire operation day.

g. The baghouse waste that Former Employee X thought was hazardous waste in 2018 was the dust from the small baghouse for the grinding booths and cleaning room (south filter).

h. Former Employee X stated that SF&E sent a sample of the waste from the small baghouse after the meeting they had with the WDNR in 2019. Former Employee X said he did not think that sample was an accurate depiction of what was contained in the small baghouse waste from the grinding booths and cleaning rooms. He felt that the sample had been collected from a sample of material from within the building itself, specifically from one of the grinding booths, and was the heavy fines that settle in the booth where the fines were created. He felt this would explain the better sample result that they obtained from that sample. He came to this conclusion because he saw the sample that went out and he did not feel it looked like all fines as he would expect from the baghouse dust waste container. Former Employee X thought the former EHS manager took the sample that he suspected was not baghouse waste.

i. Former Employee X commented that SF&E did not want to replace the bags in the baghouses. When he was asked about this comment, Former Employee X explained that, inside the unit, there is a cloth bag inside the baghouse and that is supposed to collect the fines and exhaust the clean air out. He explained if you have a lot of pressure and a light media like the bags they used, the bags are going to break down. He said the meters would fluctuate indicating that the bags inside the baghouse were failing. He said when you are drawing a negative pressure in a baghouse it needs to be fixed and the bags are not in the best shape. Former Employee X said he sent out for quotes when this occurred because they were not drawing the right pressures. He said this was done on his own because his mechanics said the baghouses were not

running efficiently or doing what they were supposed to do. This was done after a meeting with the WDNR, maybe 5-6 months after he returned the second time. Former Employee X again confirmed that SF&E sends the baghouse waste off as regular waste, which saves the company a lot of money.

j. Former Employee X said the baghouse bags were supposed to be switched out every other day. The big baghouse was dumped daily, but the average for the small baghouse was to be switched every other day. If it didn't the bag would over fill and come off the shoot and spill all over the ground. Former Employee X said the spilled material would stay on the ground, and they would hope for rain to wash it away. Former Employee X said if it wasn't raining, they would use the bobcat and scoop it up.

k. Former Employee X told Warden Dieckhoff that his (Former Employee X's) biggest concern was the handling of the baghouse dust. He knows the material to be hazardous waste because he has seen the past test samples. The chromium levels would vary, and would vary quite a bit, but a previous EHS manager continuously sampled when he was at SF&E, and Former Employee X had pulled samples in 2008-2011 occasionally for his previous EHS manager. Former Employee X informed Warden Dieckhoff that back then baghouse waste was routinely sent out for samples, and he thought maybe back then the waste was sent into a different roll-off for disposal. It was not mixed directly with the sand.

l. Former Employee X told Warden Dieckhoff that he (Former Employee X) knew that SF&E was taking inaccurate samples to get the samples they need. There were multiple tests that had to be done, the drain water (tested by an outside firm), and the dust were the biggest. He watched one time for sure that the former EHS manager picked up a handful of the grinding scraps and put it into the sample jar, and this was pre-2019. He saw the dust she picked up in the hopper, but she only put an inch or so in the bottom, but then when she sent the jar out it was full. This likely happened in October 2019.

m. Former Employee X also told Warden Dieckhoff that it was "hush, hush" about the baghouse, and this came specifically from the EHS manager. When SF&E sent the sample out post-2019, she just said to Former Employee X that they were sending the sample out and that "this will be good." Former Employee X asked if she was sure, and she responded, "oh yeah." That confirmed to Former Employee X that she rigged the sample somehow.

26. Also, among the interview reports provided to me by Mr. Dieckhoff was an interview report dated October 2, 2022, concerning an interview of another former Stainless Foundry employee, whom I will refer to as "Former Employee Y" (also due to Privacy Act concerns). According to the report of this interview, Former Employee Y made the following statements to Warden Dieckhoff:

a. Former Employee Y stated that he worked at SF&E from approximately June 23, 2020, to November 2021 (until the week before Thanksgiving). He was hired to be the Human Resources and Safety Specialist but ended up doing most of the purchasing after being trained on the systems by an employee of 30 years at SF&E.

b. When asked about the two baghouses at the Stainless Foundry facility, Former Employee Y described the baghouses as "gross," and said that they were not big enough. He said the pipes were all rusted and full of holes due to the sand and particles acting like a sand blaster and over time they wore a hole in the pipes.

c. Former Employee Y said that he did not feel the baghouses were doing what they were supposed to do and explained that SF&E would just order parts to patchwork the equipment instead of replacing it.

d. Former Employee Y said the baghouses could be down for two hours to two days, and they would continue running processes during that time with no filtration.

e. Former Employee Y said that a representative from Sigma Environmental had come in for the air sampling and Former Employee Y asked him what the worst facility he monitors was, and he told Former Employee Y that SF&E was the worst.

f. When Warden Dieckhoff showed Former Employee Y photographs of plastic bags, photos #3, #10, #16, that the WDNR investigators suspected may have been from baghouse waste, Former Employee Y initially was unsure where they would have come from in the facility. Warden Dieckhoff showed him a photo of the baghouse lugger with ripped bag, photo #16, and Former Employee Y commented that the bags were not supposed to be ripped and were supposed to be attached to the baghouse piping. Former Employee Y then recognized that bag as being the same as the very large bags in our other photos. He described photo #16 as the baghouse for some machines. He said the material in the bags can change because depending on the metals they are grinding will depend on what is made up of that waste. Former Employee Y said he figures there was always chromiums[*sic*], aluminums[*sic*], and silica in all of them even though the waste may change depending on what metal alloys they are running at any given time.

g. Former Employee Y said that the baghouse in photo #16 is the small baghouse. Former Employee Y thought the waste in the lugger in that photo would be just thrown away, not put into a specific location.

27. Among the other documents provided to me by Warden Dieckhoff was a copy of a report of a "FULL AIR COMPLIANCE EVALUATION" inspection of the Stainless Foundry facility conducted on March 27, 2007. According to this report, SF&E "is a primary metals manufacturer of ferrous and nonferrous castings used primarily in the pump manufacturing and dairy industries." The report describes facility operations as follows:

The facility receives three types of sand: shell sand, core sand (50 grade), and mold sand (70 grade). The sand is received via bulk tanker truck. Shell sand is specifically used for shell sand cores. Core sand is used for the green sand molding operations and the pep-set mold operations. The cores and molds can be coated and washed, depending on the desired characteristics of the final product. The molds and cores are assembled and go to the melt room. Here one of 6 furnaces prepares the metal for pouring. Once the casting is cooled, the sand is removed and the casting is removed. The casting is prepared by various means including; shake-out, vibratory (Wheelabrator), sandblast, arc-air, wire blast, grinding and/or welding/cutting. Particulate emissions are controlled by two baghouses. The Wheelabrator vents to a dedicated baghouse C42 (C4004). The remaining sand foundry operations vent to C43 (C4011) and C44 (C4012).

28. The descriptions of facility operations and the control of particulate emissions by two baghouses are consistent with the information derived from the reports of interview of the former SF&E employees summarized above.

29. The air compliance evaluation report described above also included a section discussing "Hazardous Air Pollutant Emissions." In this section, the report states that "[t]he facility operates and maintains bag house control devices to control particulate matter emissions including Chromium, nickel and manganese." Based on my training and experience, I have interpreted this description as indicating that the particulate emissions generated by the SF&E facility and controlled by the baghouses include chromium, which is a metal that can be a hazardous waste constituent.

30. Another document provided to me by Warden Dieckhoff was a waste profile which SF&E prepared in November 2020 and provided to the Emerald Park Landfill. This waste profile identifies "ceramic shell" waste and a waste known as "foundry sand," both of which are characterized as non-hazardous. However, the waste profile and does not identify "baghouse dust."

31. Among the interview reports that Mike Dieckhoff sent us is a report of an interview of WDNR Waste Management Specialist Ben Petrus. According to this report, Mr. Petrus advised Warden Dieckhoff that "if SFE was [sic] doing cutting and grinding of stainless-steel parts, and that material was being collected and being disposed of in a landfill, the concentration of chrome in the stainless steel is typically enough to fail TCLP for chromium," and that the resulting "baghouse dust would have a very high likelihood that it would fail TCLP." However, [i]f SFE was [sic] making materials using High Carbon Steel, they wouldn't be adding chrome to that process in all likelihood." According to Mr. Petrus, "it is especially concerning with stainless steel that the chromium level would be high."

32. On February 8, 2023, I examined Stainless Foundry's website at www.stainlessfoundry.com, and identified the following statement: "Over 250 alloys are poured at SF&E, with groups including: Stainless Steel, Hardenable & Non-Hardenable, Heat-Resistant Stainless, Nickel Alloys, Cobalt Alloys, Carbon & Low-Alloy Steels, Cast Irons, Tool Steels and Specialty Alloys." Therefore, I have reason to believe that SF&E likely handles stainless steel in

its grinding and other operations.

33. I also noted that Stainless Foundry also appears to pour brass and bronze as part of the facility's operations. Based on my training and experience, I am aware that both of these alloys may contain lead, and that red brass is known to have a higher concentration of lead. I also am aware that stainless steel may also have a bit of lead, although it is considered an impurity and should be at a low concentration. Lead may also be a constituent of concern if the company is pouring large quantities of leaded alloys.

34. The federally enforceable RCRA-authorized hazardous waste regulation at Wisconsin Administrative Code (WAC) § NR 662.020 requires that a generator of hazardous waste who transports, or offers for transport, a hazardous waste for off-site treatment, storage or disposal shall prepare a manifest, and shall designate on the manifest one facility which is licensed or permitted to handle the waste described on the manifest. Warden Dieckhoff also provided me with a copy of a report identifying all hazardous waste manifests for Stainless Foundry's offsite shipments of hazardous waste to the States of Indiana, Missouri and Montana. According to this report, Stainless Foundry never prepared a manifest covering offsite shipments of baghouse dust generated at the SF&E facility.

35. In addition, I reviewed the State of Wisconsin's records on hazardous waste manifests prepared by Stainless Foundry; these records similarly did not include any evidence that Stainless Foundry had ever prepared manifests for its offsite shipments of baghouse dust.

36. The information set forth above indicates that the baghouse dust generated by at least one of the baghouses at the SF&E facility may contain chromium at concentrations high enough to make the baghouse dust a hazardous waste under RCRA. In addition, the information described above indicates that one or more violations of RCRA and its implementing regulations may have been committed at the SF&E facility, because, if the baghouse dust generated from one of the baghouse units at the facility is a hazardous waste, the company's handling of this waste as nonhazardous would lead to violations of the federal and State of Wisconsin's RCRA-authorized hazardous waste regulations. For example, the regulation at WAC § NR 662.011 (corresponding federal regulation is 40 C.F.R. § 262.11) requires that any person who generates a solid waste must determine if that waste is a hazardous waste using the following method: (1) the person may determine if the waste is excluded from regulation; (2) the person then shall determine if the waste is listed as a hazardous waste in WAC subch. D of ch. NR 661 (lists of hazardous wastes); (3) if the waste is not listed, the person shall determine any characteristics of the waste per WAC subch. C of ch. NR 661 (characteristics of hazardous wastes); and (4) if the waste is determined to be hazardous, the person generating the waste shall determine any additional restrictions or exclusions pertaining to management of the waste. If SF&E has mischaracterized the baghouse dust as nonhazardous, the company would have violated this regulation, which is part of the federally enforceable RCRA-authorized hazardous waste rules in Wisconsin.

37. As noted above, the federally authorized Wisconsin hazardous waste regulation at WAC § NR 662.020 requires that a generator of hazardous waste who transports, or offers for transport, a hazardous waste for off-site treatment, storage or disposal shall prepare a manifest,

and shall designate on the manifest one facility which is licensed or permitted to handle the waste described on the manifest. WAC §§ NR 662.030, 662.031 and 662.032 impose packaging, labeling and marking requirements for hazardous waste offered for off-site shipment. As noted above, the hazardous waste manifests on file with the States of Wisconsin, Missouri and Montana for Stainless Foundry do not identify baghouse dust; this demonstrates that there were no hazardous waste manifests prepared for the offsite shipments of this baghouse waste. The company therefore would have violated the manifest regulations if it caused baghouse dust which was hazardous waste to be shipped offsite as nonhazardous. Any violation of regulations promulgated pursuant to Subtitle C (Sections 3001-3023 of RCRA, 42 U.S.C. §§ 6921-6939e) or any state provision authorized pursuant to Section 3006 of RCRA constitutes a violation of RCRA, subject to the assessment of civil penalties and issuance of compliance orders as provided in Section 3008 of RCRA, 42 U.S.C. § 6928.

38. In addition, the WDNR civil enforcement personnel provided information to me in February 2023, indicating that Stainless Foundry may have accumulated hazardous waste for more than 90 days. More specifically, according to EPA's online compilation of electronic hazardous waste manifests (RCRAInfo "E-Manifest" record system), SF&E's had sent out a shipment of hazardous waste on 8/19/2021 (rcra-report-2-16-2022-1024); in response to a request from the WDNR, on February 3, 2022, SF&E provided a copy of an incomplete manifest showing that, in calendar year 2021, only one potential shipment of hazardous waste with an accompanying manifest had occurred since 8/19/2021, specifically on December 22, 2021. Note, the copy of the manifest provided by SF&E was not signed by the receiving TSDF, nor was this manifest uploaded into the RCRAInfo E-manifest record system. The next shipment of hazardous waste from SF&E occurred on 2/22/2022 and contained roughly double the typical amount of waste that historically was shipped out from the SF&E facility. This gap in the record suggests that SF&E may have accumulated hazardous waste in the form of Kolene sludge for at least a period of 123 days, and maybe as long as 167 days. Because SF&E is a Large Quantity Generator of hazardous waste, it may accumulate hazardous waste onsite for no more than 90 days under WAC § NR 662.034(2). If SF&E failed to comply with this 90-day accumulation requirement, this potentially would have required SF&E to obtain a hazardous waste treatment, storage or disposal license.

39. It is my professional assessment that a complete compliance-evaluation inspection of the SF&E facility is warranted, and that samples of the baghouse dust generated from facility operations should be collected and analyzed for the presence and concentration of chromium and lead. In addition, it is my professional assessment that a full compliance-evaluation inspection should be performed at the facility, and that samples of Kolene sludge and filter cake waste also should be collected.

40. It is my preference that the inspection of the SF&E facility be conducted without prior notice to the company. Because two former employees of Stainless Foundry have alleged that the company's operators deliberately concealed the fact that the baghouse dust from at least one of the baghouses was a hazardous waste due to chromium, I am concerned that, if the operators of SF&E are told in advance that U.S. EPA intends to inspect the facility, they may attempt to remove the baghouse dust from the air pollution control units and conceal or dispose of it, in

order to prevent the inspection team from collecting samples of that dust, the analysis of which may prove that the baghouse dust is hazardous waste.

41. The assertions I make in this affidavit are truthful, and, if called to testify as a witness, I am prepared to testify under oath to the accuracy of the observations and statements contained in this affidavit, based on my personal knowledge.

42. Based upon the information set forth above, I respectfully submit that there is probable cause to believe that hazardous wastes in the form of baghouse dust, filter press solids and Kolene sludge are present at the Stainless Foundry & Engineering facility, and that these hazardous wastes are being accumulated, treated, stored, disposed of, transported or otherwise handled in violation of federal hazardous waste regulations promulgated under the authority of RCRA, Title 42, United States Code, Sections 6922 or 6924, or federally-enforceable hazardous waste regulations promulgated as part of an authorized state hazardous waste program under Title 42, United States Code, Section 6926, and that evidence and instrumentalities relating to such violations, as further described in Attachment B, will be found at the SF&E facility, as further described in Attachment A. I therefore respectfully request that this Court issue an administrative search warrant for the SF&E facility, authorizing the inspection and sample-collection activities described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____
Brenda Whitney
Environmental Engineer
U.S. EPA, Region 5


Subscribed and sworn
before me this 17th day of May, 2023
_____
Honorable William E. Duffin
United States Magistrate Judge
Eastern District of Wisconsin

## Attachment A – Premises to be Inspected/Searched

Stainless Foundry & Engineering, Inc.
5150 N. 35th Street
Milwaukee, Milwaukee County, Wisconsin

SF&E consists of two separate buildings. The northernmost building is the main manufacturing facility, mostly one level, constructed on the exterior of cinderblock. Some offices appear to be located in the west side of the facility. The east portion of the main building (shares a common wall) is noted as having a separate address of 5152 E. 35th Street, Milwaukee, Wisconsin, and is identified as Inspectech, Corp., which is a non-destructive technology inspection laboratory that provides services to foundries, aerospace equipment manufacturers, and the military. It is unknown at this time if a corporate connection exists between SF&E and Inspectech.

The southernmost building in the southwest corner of the image below, has an address of 5110 N. 35th street and appears to be a 4-story brick building of offices. This building is occupied by SF&E. According to WDNR inspection reports, a wood shop may occupy the first floor of the building. The building otherwise does not have the appearance of a manufacturing facility for foundry activities from the outside.



This image is copied from Google Maps.

## Attachment B – Inspection Activities and Items to be Seized/Collected

1. Taking of readings using an X-Ray Fluorescence (XRF) device (to determine whether baghouse dust has contaminated the surrounding grounds and soils of the SF&E property).

2. Physical samples of baghouse dust from the baghouses.

3. Physical samples of Kolene sludge.

4. Physical samples of "filter press solids" or the solids removed from the Kolene process's rinse water prior to discharge to the sanitary sewer.

5. Taking of photographs.

6. Collection/copying of records relating to the generation, treatment, storage, disposal, shipment or other handling of hazardous wastes at the SF&E facility.